Mark Bradford (MB 6002)
MARK BRADFORD, PC
299 12th Street
Brooklyn, New York 11215-4903
Telephone: (347) 413-3287
mb@markbradfordpc.com

Cara R. Burns (CB 1071) (PHV to be requested)
MIMS, KAPLAN, BURNS & GARRETSON
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677
Telephone: (310) 314-1721
Facsimile: (949) 340-9737
cburns@hmkblawyers.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────x

| | |
|---|---|
| CEREMONY OF ROSES ACQUISITION LLC, | CIVIL NO. 1:25-cv-7151 AT |
| Plaintiff, | DECLARATION OF ALAN SITCHON IN SUPPORT OF EX PARTE APPLICATION FOR: A TEMPORARY RESTRAINING ORDER; SEIZURE ORDER; AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION AND SEIZURE ORDER SHOULD NOT ISSUE |
| v. | |
| JOHN DOES 1-100, JANE DOES 1-100 AND XYZ COMPANY, | |
| Defendants. | |

─────────────────────────────────────x

I, Alan Sitchon, hereby declare as follows:

    1.    I make this declaration in support of Plaintiff Ceremony of Roses Acquisition LLC's ("Plaintiff") ex-parte application for: a temporary restraining order; seizure order; and an order to show cause why a preliminary injunction and seizure order should not issue in the above referenced matter to halt the sale of and seize unlawful goods bearing the federally registered

1

trademarks, service marks, likenesses, logos and other indicia of the musical artist "**BENSON BOONE**" (the "Artist") at the Artist's concerts including on Saturday, September 6, 2025 at Madison Square Garden in New York, New York. The tour has just begun and so have Defendant Bootleggers infringing activities. See paragraphs 10-12 herein and Exhibits C and D attached hereto. Similar orders have been granted by this District Court and by other District Courts to other performers. See Certificate of Counsel and Exhibits thereto. I have personal knowledge of the facts set forth herein and am authorized by Plaintiff to make this declaration. If called as a witness, I could and would be able to testify competently to such facts.

2. Plaintiff is engaged in the business of manufacturing, distributing and selling authorized merchandise such as T-shirts, sweatshirts, and posters, among other merchandise bearing the trademarks, service marks, likenesses, logos, and other indicia owned by popular performers (collectively "Tour Merchandise"). Plaintiff has obtained the exclusive right to distribute authorized Tour Merchandise bearing the Artist's Trademarks (collectively "Authorized Tour Merchandise") at all of the Artist's concerts in the United States and elsewhere (the "Tour"). A true and correct list of the concert dates on the Arist's Tour is attached as Exhibit A and is incorporated by this reference as though fully set forth herein.

3. I am Vice President of Tour for Plaintiff. I have been employed by Plaintiff or The Thread Shop, which merged into Plaintiff, for over 5 years. Prior to that, I was employed in similar positions at other merchandising companies concentrating products of musical performers, including at Signatures Network, Inc. and Cinder Block, LLC. I supervise merchandising and security on the Tour. I have personally supervised merchandising and bootleg security on over 100 musical tours.

2

4.      "BENSON BOONE" is the trademark for this prominent and successful musical performer, in commercial use for nearly 5 years. The Artist is also known by his nickname "BENNY BOONE", which is referenced in one of his most popular songs ("Sorry, I'm Here for Someone Else").  The Artist's well-known single recordings include: the aforementioned "Sorry, I'm Here for Someone Else" (streamed over 228 million times on the music streaming service Spotify, its video featuring the Artist has been viewed on YouTube.com over 11 million times and performed on "Saturday Night Live" television program broadcast nationwide on May 3, 2025); "Beautiful Things" (streamed over 2.3 billion times on Spotify and its video featuring the Artist has been viewed on YouTube.com over 764 million times); "In the Stars" (streamed nearly 1.2 billion times on Spotify and its video featuring the Artist has been viewed on YouTube.com over 74 million times);  "Slow It Down" (streamed over 860 times on Spotify and its video featuring the Artist has been viewed on YouTube.com over 83 million times); and "Mystical Magical" (streamed over 220 million times on Spotify and its video featuring the Artist has been viewed on YouTube.com over 26 million times). In addition to Saturday Night Live, the Artist has appeared as a performer on other television programs broadcast nationwide including: American Idol (appearing in 2021 and being advanced, but he withdrew from the competition); the Tonight Show (on and June 4, 2025 and April 10, 2024); the American Music Awards (on May 26, 2025); the 67th Grammy Awards (on Feb 2, 2025); the Today Show (on April 9, 2024); Jimmy Kimmel Live (on February 1, 2024); and Late Night with Seth Meyers (on March 2, 2022). The Artist been nominated and won for numerous awards, including: nominated for a Grammy Award for Best New Artist in 2025 by the Academy of Recording Arts and Sciences; nominated for 4 MTV Video Music Awards and winning in 2024 for Best Alternative Video; and nominated for 5 American Music Awards in 2025 including Favorite Male Pop Artist, Song of the Year and New Artist of

3

the Year. The Artist has been discussed or profiled in many newspapers and magazines, including the Wall Street Journal (including on July 24, 2025 featuring his photograph and noting his recording "Beautiful Things") and New York Times (including a June 30, 2025 profile entitled "Benson Boone, a Showy Male Pop Star for this American Moment").

5. "BENSON BOONE" is a federally registered trademark, Registration No. 7793295 for use in connection with: International Class ("IC") 025 headwear, hoodies, shirts, hooded pullovers, hooded sweatshirts, short-sleeved or long-sleeved t-shirts, short-sleeved shirts, sweatshirts, caps being headwear, and T-shirts; IC 041 entertainment services; IC 009 audio and video recordings featuring music and artistic performances, and other recordings goods; and IC 035 on-line retail store services featuring audio recordings, clothing, collectibles, and a wide variety of products related to a musical artist.

6. This Tour is highly anticipated, so almost all concert dates are sold out. Because of the Artist's status among popular music enthusiasts, the Tour is expected to be very successful. The Tour involves many large-capacity venues, seating more than 10,000 people. Sales of Authorized Tour Merchandise are expected to be very substantial.

7. The Artist derives income and promotes his image in part from sales of recordings and live performances, and in part through the sale of merchandise associated with him. The Artist and Plaintiff spend a great deal of care, time and money in developing the Authorized Tour Merchandise bearing the Artist's Trademarks, including to make sure they are high quality and are appropriate to his image.

/ / /

8. Authorized Tour Merchandise is sold only at specific locations at each venue. These locations have a variety of different merchandise for consumers to buy. A true and correct copy of some of the Authorized Tour Merchandise that will be sold at the Artist's concerts is attached hereto as Exhibit B and is incorporated by this reference as though fully set forth herein.

9. Tours by the Artist and other performers of his stature have recurring problems with individuals who sell infringing Tour Merchandise near, at and sometime inside each concert venue. These individuals are referred to as "Bootleggers," their activities are known as "Bootlegging" and their goods are referred to as "Bootleg Merchandise" or "Infringing Merchandise."

10. The Artist's tour has just begun, and Defendant Bootleggers have appeared and are selling their Infringing Merchandise, as described in more detail below. To combat such illegal activities on major concert tours, Plaintiff has obtained temporary restraining orders and seizure orders, and thereafter preliminary injunctions and nationwide seizure orders to seize the Infringing Merchandise from the Defendant Bootleggers. See Certificate of Counsel filled herewith.

11. At the Artist's prior concerts including last night, Wednesday, August 27, 2025 at Little Caesars' Arena in Detroit, Michigan, Monday, August 25, 2025 at the Nationwide Arena in Columbus, Ohio, Saturday, August 23, 2025 at the United Center in Chicago, Illinois, and Friday, August 22, 2025 at the Xcel Energy Center in St. Paul, Minnesota, Defendant Bootleggers appeared selling Infringing Merchandise. Plaintiff's staff and hired others (including off-duty or retired law enforcement officers) went into the crowds before, during and after last night's concert to document the Defendant Bootleggers' activities and their Infringing Merchandise. Some of the results obtained from these concerts are contained in Exhibits C and D.

12. Plaintiff took photographs of some of the Defendant Bootleggers at the concerts; but notably sometimes it was dark and/or the Defendant Bootleggers moved quickly, especially if

5

they saw we were trying to photograph them.  True and correct copies of photographs taken of some of the Defendant Bootleggers are attached hereto as Exhibit C.  We saw many of the same infringing shirts containing the Artist's Trademarks being offered for sale by different Defendant Bootlegger at each concert.  True and correct copies of photographs of some of the Infringing Merchandise being sold by Defendant Bootleggers are attached hereto as Exhibit D.  Each shirt photographed was being offered for sale by different Defendant Bootleggers, but the designs are the same or similar and all contained the Artist's Trademarks.

13.     Defendant Bootleggers sold their infringing merchandise outside before the concerts, preempting Plaintiff's ability to sell the shirts inside and selling for much less than Plaintiff.. Defendant Bootleggers also sold their Infringing Merchandise in the parking lots at the venues and along the roads nearby, both of which also interferes not only with Plaintiff's sales but with traffic and creates safety problems..  Defendant Bootleggers offered to sell infringing shirts for about $10-$20 on average, but many agreed to sell for less when asked and especially at the end of the night.  The Infringing Merchandise was printed on "seconds," which we could tell because they had split hang tags, removed tags, or had other marking such as a line through the label or red tape. "Seconds" are inferior quality merchandise and usually are purchased for substantially less than first quality goods.

14.     Defendants' bootlegging activities have grown due to the increased demand for performers' products.  Surprisingly, the Defendant Bootleggers tend to sell identical or virtually shirts, indicating that they are probably supplied from a common source.  Individual Bootleggers follow tours, or arrange to have local individuals sell the Infringing Merchandise for them.  Many designs also have tour dates and venues on them, which also indicates that they will continue to go from venue to venue and sell their Infringing Merchandise. Further, although there are hundreds

6

of thousands of images of the Artist and designs associated with an artist that are available on the internet and elsewhere for Defendant Bootleggers to use in his/her Infringing Merchandise, usually the same or substantially the same designs - often ripping off Plaintiff's designs created inhouse (and therefore also violate our copyrights) - repeatedly appear on the Infringing Merchandise sold during a tour.  These facts show that the only logical conclusion is that Defendant Bootleggers must be coopering with each other.

15.     In the present circumstances, given the Artist's popularity, it is not difficult to understand the motives of the Defendants.  All of the concerts on this Tour sold out or nearly sold out, which means the Artist will be performing before hundreds of thousands of people.  Fans purchase souvenirs from the concerts, such as a T-shirt or a poster.  Without the orders sought, Defendant Bootleggers, who are usually located outside the venues, have the first and last chance to make these sales.

16.     Plaintiff seeks these orders only for this Artist's tour to enforce its trademark rights for only this Artist.  Plaintiff does not seek an order that can be used: for any other artist or group, for any other trademarks rights other than those of the Artist, or for any other tour.

17.     Based on Plaintiff's extensive experience in this area, as well as the observed and documented activities of the Defendant Bootleggers at the recent concert by the Artist, without the order we seek, when members of my staff and others ask Defendant Bootleggers to stop selling Infringing Merchandise, they usually just walk away and/or continue to sell the Infringing Merchandise. The Defendants do not respond when asked for their names.  Because they know what they are doing is wrong, Defendant Bootleggers sometimes say that they want to see our "injunction" or "order" – obviously referring to the seizures order that we seek from this Court.  The Infringing Merchandise they were selling contained the performer's trademarks and tour

7

locations, as well as designs, images and logos of the performer which are exclusively licensed to Plaintiff to be sold at venues.

18.     Bootlegging activities greatly injure musical performers, including the Artist, and legitimate merchandisers, including Plaintiff, in several ways. The Defendant Bootleggers are not bound by contract to provide first-quality apparel and graphic designs, as is required of Plaintiff. As mentioned above, the Defendant Bootleggers can undersell my employer, the Plaintiff, who is the legitimate merchandiser, because, unlike Plaintiff, Defendant Bootleggers have no obligation to pay the Artist royalties or pay any part of their sales to the concert venue. This ability to undersell the legitimate Authorized Tour Merchandise is also enhanced by the fact that Defendant Bootleggers do not collect or pay sales or other taxes.

19.     The consumer, the fans of the Artist, also suffer. Infringing Merchandise is an inferior imitation which is not well-made. The quality of the T-shirts and the designs are poor; as noted above, often they are printed on second quality merchandise. The fans are disappointed and, in their confusion as to the source of the Infringing Merchandise, blame the performers. This affects future legitimate sales and also tends to create a negative feeling by the fans directed at the performers, which may in turn cause decreased record sales and concert attendance.

20.     The Defendants' Infringing Merchandise causes the public to believe that their Infringing Merchandise is authorized, approved and sponsored by the Artist. Consequently, not only does the sale of this Infringing Merchandise violate our exclusive rights, but also causes the public to be adversely affected. It damages the Plaintiff's and the Artist's reputations for excellence and integrity in the legitimate Authorized Tour Merchandise in a way that is incalculable.

21. Defendant Bootleggers and those involved in the illegal merchandising activities do not keep records and operate a cash only business. Based on Plaintiff's experience with such Defendants, I believe these Defendants would dispose of or destroy any Infringing Merchandise or related documents should legal proceedings be commenced against them. Further, the harm caused by the Defendants deprives the rightful owners of their return. Accordingly, we seek to curtail the Bootlegging activities of the Defendants by seeking the assistance of this Honorable Court to obtain an order allowing the seizure of Infringing Merchandise.

22. The people who serve the orders and seize Infringing Merchandise consist predominately of off-duty law enforcement officers who are well versed in seizing Infringing Merchandise. They will seize only the Infringing Merchandise and provide receipts. They do not make arrests, as it is a civil seizure order. The objectives are to serve the restraining and seizure order, preserve the Infringing Merchandise, see if Defendant Bootleggers will provide contact information (which they rarely provide), and provide a receipt, then move onto the next bootlegger.

23. I believe the difficulties in identifying Defendant Bootleggers, including that they have no fixed place of business, no assignable assets, and operate by cash only, makes them basically immune to normal process or to any process except by way an order against them to allow the seizure of the Infringing Merchandise pending a final disposition by this Court.

24. Plaintiff is a substantial and successful business and will be able to meet any order made to compensate any defendant for any damages suffered as a result of any order obtained on our behalf. However, in my experience, no Bootlegger has ever appeared at an order to show cause hearing or sought relief in any of the prior nationwide seizure orders granted. Plaintiff also requests that it be appointed substitute custodian for the Infringing Merchandise it requests the Court to permit it to seize.

25. In sum, absent a Court issuing the requested seizure order, the Defendant Bootleggers have an extreme advantage over us/Plaintiff, the legitimate merchandiser, who obtain the legal and legitimate right to use the Artist's trademarks, service marks, likenesses, logos and related rights on Authorized Tour Merchandise. Further, Defendants' sale of Infringing Merchandise harms not only us, the Plaintiff, but also harms the consumers who buy those shoddy, unlicensed goods. Experience has shown that the requested seizure order is *the* only effective way to stop the sale of Infringing Merchandise.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct. Executed August 28, 2025.

**ALAN SITCHON**